IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THEODORE BROWN,            :
                          :
        Plaintiff,         :        CIVIL NO. 4:08-CV-2226
                          :
    v.                     :        Hon. John E. Jones III
                          :
UNITED STATES OF AMERICA, *et al.*, :
                          :
        Defendants.        :

## **MEMORANDUM**

March 12, 2010

## **THE BACKGROUND OF THIS MEMORANDUM IS AS FOLLOWS:**

Plaintiff Theodore Brown ("Plaintiff" or "Brown"), an inmate currently

confined at CCM New York in Brooklyn, New York[1], filed this action *pro se* asserting

*Bivens*[2] claims under 28 U.S.C. § 1331 and the Federal Tort Claims Act ("FTCA"). In

---

[1]Although Brown filed a Notice (Doc. 44) with the Clerk of Court on March 11, 2010 requesting that his mail be sent to a private address because it is "the only stable address where I will be able to receive all updated mailings from the court," the Federal Bureau of Prisons ("BOP") Inmate Locator service indicates that Brown still is confined at CCM New York. *See* http://www.bop.gov/iloc2/LocateInmate.jsp. Nevertheless, Brown's mailing address has been updated on the docket.

[2]*Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). *Bivens* stands for the proposition that "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official." *Butz v. Economou*, 438 U.S. 478, 504 (1978).

the Complaint, filed on December 12, 2008, Brown names as Defendants the United States of America, as well as the following employees of the United States Penitentiary- Canaan in Waymart, Pennsylvania ("USP Canaan"): Physician Assistant ("P.A.") Stephen Tucker; Daniel Holloway, M.D.; and Correctional Officer Albert Felker.[3]  (Doc. 1.)  Presently pending is a Motion to Dismiss and/or for Summary Judgment filed on behalf of Defendants.  (Doc. 14.)  The Motion has been fully briefed and is ripe for disposition.  For the reasons set forth below, the Motion will be granted.

In his Complaint, Brown asserts a two-part claim under the FTCA.  First, he alleges that, on October 12, 2007, while he was an inmate at USP Canaan, he sustained personal injuries when he was struck and run over by an E-Z Go cart operated by Defendant Felker.  (Doc. 1 ¶¶ 5-6, 15-23.)  Second, he alleges that the "severe injuries" he sustained to his "shoulder, neck, back, knee, legs, foot and other parts of his body have become lifetime injuries caused by the BOP deprivation of the mandatory community standard of care on October 18, 2007, and continuing through February, 2008 when the Plaintiff was transferred to Fort Dix Prison." (*Id.* ¶¶ 23-41.)

---

[3]Plaintiff initially named as Defendant "prison official who ran over Plaintiff and refused to provide his name." Defendants subsequently identified this individual as Felker.  At the time of the filing of the instant Motion, Felker had left his position with the BOP for employment with a different government agency.  (Dfts. Ex. 1, Felker Decl. (under seal).)

Brown also raises *Bivens* claims under the Eighth Amendment against Defendants Felker, Tucker, and Holloway. Brown alleges that Felker violated the Eighth Amendment prohibition against cruel and unusual punishment by crashing into him, thereby causing him to sustain injuries. (*Id.* ¶ 60.) He also alleges that Defendants Tucker and Holloway exhibited deliberate indifference to his serious medical needs in violation of the Eighth Amendment by failing to provide him with the mandatory standard of care and by "intentionally denying and delaying" his access to medical care from the time he allegedly sustained his injuries on October 18, 2007 through February 2008, when he was transferred to the Fort Dix Federal Correctional Institution ("FCI Fort Dix") in Fort Dix, New Jersey. (*Id.* ¶¶ 61, 62.) Service of the Complaint was directed by Order dated January 9, 2009. (Doc. 7.) Defendants filed the instant Motion (Doc. 14) on March 30, 2009, and after requesting an extension of time, which was granted, on April 28, 2009, they submitted a supporting brief (Doc. 21), statement of facts (Doc. 22), and supporting materials (Doc. 21-2, 21-3, and 21-4). On the same date, Defendants also filed a Motion to File Documents Under Seal (Doc. 23) in which they requested that Exhibits 1, 2, 3, and 7 in support of the instant Motion be placed under seal. After review of the Exhibits, which were submitted *in camera*, the Motion was granted by Order dated May 7, 2009, and

Exhibits 1, 2, 3, and 7 remain under seal. (Doc. 25.) After requesting an extension of time, which was granted, on June 1, 2009, Brown filed his opposition brief. (Doc. 28.) Defendants requested and were granted an extension of time to file a reply brief, and on June 18, 2009, the reply brief was filed. (Doc. 31.) Therefore, the Motion is ripe for review.

# I.     STANDARDS OF REVIEW

## A.     Motion to Dismiss

Defendants seek dismissal of Brown's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). In the alternative, Defendants seek summary judgment and have submitted evidentiary documents outside the pleadings in support of their motion. Federal Rule of Civil Procedure 12(d) provides:

> **(d) Result of Presenting Matters Outside the Pleadings.** If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d). In light of the fact that Defendants submitted matters outside the pleadings with the instant Motion and styled it as seeking dismissal, or in the alternative, summary judgment, this Court's May 22, 2009 Order granting Brown an extension of time to file his opposition specifically directed him to file his opposition,

including an opposition brief as required by Middle District of Pennsylvania Local Rule ("LR") 7.6, and a statement of material facts as required by LR 56.1. (*See* Doc. 27.) Although Brown filed a brief in opposition (Doc. 28) to the instant Motion on June 1, 2009, he did not file a statement of material facts as required by LR 56.1. Accordingly, the Court will not exclude the evidentiary materials accompanying Defendants' Motion because Brown was given a reasonable opportunity to present material relevant to the Motion and failed to do so, and the instant Motion will be treated solely as one seeking summary judgment.

### B.    Summary Judgment

Summary judgment is appropriate if the record establishes "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant meets this burden by pointing to an absence of evidence supporting an essential element as to which the non-moving party will bear the burden of proof at trial. *Id.* at 325. Once the moving party meets its burden, the burden then shifts to the non-moving party to show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). An issue is "genuine" only if there is a

sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a factual dispute is "material" only if it might affect the outcome of the action under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

In opposing summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985). However, the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the non-moving party. *P.N. v. Clementon Bd. of Educ.*, 442 F.3d 848, 852 (3d Cir. 2006).

Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them. *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982). Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48.

## II.    DISCUSSION

### A.    Undisputed Facts

#### 1.    Facts Relating to October 18, 2007 Incident

Because Brown failed to file a separate statement of material facts controverting the statement filed by Defendants as he specifically was directed to do by this Court's May 22, 2009 Order (Doc. 27), all material facts set forth in Defendants' Statement of Material Facts ("SMF") (Doc. 22) will be deemed admitted. *See* LR 56.1.[4] Defendants' Statement and supporting exhibits (Doc. 21-2) establish the following undisputed facts material to the instant Motion:

On October 18, 2007 at approximately 8:45 p.m., as Brown was leaving the pill line from the Green Corridor at USP Canaan to return to his housing unit, he walked into the side of a yellow E-Z Go cart operated by Defendant Felker.  (Doc. 22, SMF, ¶¶ 3-4; Ex. 1, Felker Decl., ¶ 5 (under seal); Exs. 2-3, Surveillance Videos Outside/Inside Green Corridor (under seal); Doc. 21-2 at 4, Ex. 5, Geary Decl.; Doc. 21-2 at 6, Ex. 6,

---

[4]LR 56.1 provides, in relevant part, as follows: "All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."

Geary Memorandum.)[5]  Brown appeared to strike the cart's roll bar, which is a black metal bar that extends from above the left rear wheel up to the highest part of the cart. (Doc. 22 ¶ 4; Ex. 1 ¶ 9; Ex. 2; Doc. 21-2 at 90, Ex. 14-A, Photograph of E-Z Go Cart's left side.)  The incident occurred when Felker was attempting to park the cart with the front of the cart facing forward for easier access.  (Doc. 22 ¶ 5; Ex. 1 ¶ 6.)  Before Felker began to move the cart, he looked behind him for any obstacles or persons. (Doc. 22 ¶ 6; Ex. 1 ¶ 7.)  Seeing that it was clear behind him, he began to back up. (*Id.*)  At that point, the cart's reverse alarm began to sound.  (*Id.*)

Brown, who is seen on the video surveillance of the outside corridor at approximately the eleven (11) second mark in a gray sweatsuit, walked directly into the path of the cart.  (Doc. 22 ¶ 7; Ex. 1 ¶ 8; Ex. 2.)  Defendant Felker briefly stopped the cart to ensure that Brown was not injured.  (Doc. 22 ¶ 8; Ex. 1 ¶ 9; Ex. 2.)  Because Brown only lightly bumped the cart with his body, and because he did not express any distress, Felker proceeded to park the cart without much concern that Brown had been injured.  (Doc. 22 ¶ 8; Ex. 1 ¶ 9.)  The rear of the E-Z Go cart never came into contact with Brown.  (Doc. 22 ¶ 9; Ex. 1 ¶¶ 9, 15.)  Brown struck the left side of the cart with the left side of his body.  (*Id.*)  Felker did not "run over" Brown with the cart.  (Doc. 22

---

[5]Citations to page numbers refer to the page number on the CM/ECF electronic record.

¶ 13; Ex. 1 ¶ 18; Ex. 2.)  Brown remained on his feet throughout the incident, and walked back into the institution immediately following the incident.  (*Id.*)  Brown did not appear to be in any distress after striking the cart with his body.  (*Id.*)

After the incident, Officer Janell Geary accompanied Brown back inside the Green Corridor and advised him to wait on a bench outside of the Lieutenant's office so that he could be seen by the on-duty P.A. after pill-line was over.  (Doc. 21-2 at 6, Ex. 6.)

After Felker parked the cart, as seen on the video surveillance of the inside corridor at approximately the one (1) minute, three (3) second mark, he relieved Officer Geary from her post inside the Green Corridor.  (Doc. 22 ¶ 11; Ex. 1 ¶ 17; Ex. 3.)  Felker recalls that, after he entered the Green Corridor, he observed Brown sitting on a bench outside of the Health Services Department waiting to be evaluated by medical staff.  (Doc. 22 ¶ 12; Ex. 1 19.)

Felker wrote a memorandum outlining the incident involving Brown and submitted it to the Lieutenant.  (Doc. 22 ¶ 15; Ex. 1 ¶ 20; Doc. 21-2 at 3, Felker Memorandum.)  Felker had no further involvement with Brown after the incident on October 18, 2007.  (Doc. 22 ¶ 16; Ex. 1 ¶ 21.)  The pictures of the cart, submitted as Exhibits 14-A through 14-E (Doc. 21-2 at 90-94), accurately depict the cart Felker was

driving on October 18, 2007, and the cart as shown on the security video. (Doc. 22 ¶ 17; Ex. 1 ¶ 10.)

Officer Geary, who is employed by the BOP as a Senior Officer Specialist, has worked at USP Canaan since February 2005. (Doc. 22 ¶ 18; Doc. 21-2 at 4, Ex. 5, ¶ 1.) The surveillance videos submitted *in camera* in this case were reviewed by Geary and accurately depict the events of October 18, 2007. (Doc. 22 ¶ 19; Doc. 21-2 at 4-6, Exs. 5-6; Exs. 2-3.) On October 18, 2007 at approximately 8:45 p.m., Geary was working at Green Corridor # 1. (Doc. 22 ¶ 20; Doc. 21-2 at 6, Ex. 6.) At that time, Geary was supervising inmates as they passed through the metal detector going to and from pill line. (Doc. 22 ¶ 21; Doc. 21-2 at 6, Ex. 6.) Brown was exiting the Green Corridor door # 1 when Geary saw and heard a yellow E-Z Go cart backing up from the left side of green door # 1. (Doc. 22 ¶ 22; Doc. 21-2 at 6, Ex. 6.) Geary heard the loud, constant tone being emitted from the cart because it was in reverse gear. (*Id.*) Geary yelled to Brown, "Watch out for the cart! Watch out for the cart!" (Doc. 22 ¶ 23; Doc. 21-2 at 6, Ex. 6.) Despite the sounding alarm on the E-Z Go cart and Geary's warnings, Brown continued to walk out the door and walked directly into the moving cart. (Doc. 22 ¶ 24; Doc. 21-2 at 6, Ex. 6.)

Geary immediately ran outside of green door # 1 and asked Brown if he was

okay.  (Doc. 22 ¶ 25; Doc. 21-2 at 6, Ex. 6.)  He stated that he was okay and did not think that he was bleeding.  (*Id.*)  Geary directed Brown to sit on the bench outside of the Lieutenant's office so that he could be seen by the on-duty P.A. after pill line was over.  (Doc. 22 ¶ 26; Doc. 21-2 at 6, Ex. 6.)  He complied and made no further complaints.  (*Id.*)  The Lieutenant and Health Services Department were notified of the incident and Geary requested that Brown be examined in order to document the incident.  (Doc. 22 ¶ 27; Doc. 21-2 at 6, Ex. 6.)  Brown was escorted into the Health Services Department without further complaints or incident.  (*Id.*)

On October 19, 2007, another inmate[6] informed Geary that he heard Brown telling other inmates on the USP Canaan compound that he had been waiting for an opportunity to be injured by a yellow cart and he wants the administration of the institution to remove the yellow E-Z Go carts so that officers no longer have access to them.  (Doc. 22 ¶ 28; 10/19/07 Geary Memorandum, Ex. 7 (under seal).)

### 2. Facts Relating to Brown's Medical Treatment at USP Canaan

On October 18, 2007, at approximately 8:50 p.m., an Inmate Injury Assessment and Follow-up form was completed for Brown.  (Doc. 22 ¶ 32; Doc. 21-2 at 8, Sullivan Decl., ¶ 4; Doc. 21-2, Medical Records, at 36, 40.)  The form reflects that, at that time,

---

[6]The inmate's identity is contained in Exhibit 7, which remains under seal pursuant to our May 7, 2009 Order (Doc. 25).

Brown informed medical staff that he was hit by an E-Z Go cart.  (Doc. 21-2 at 40.)

He complained of soreness in his left shoulder and left foot.  (*Id.*)  An examination

revealed tenderness with movement in his left shoulder and tenderness with movement

in his left foot.  (*Id.*)  No deformities or swelling were noted.  (*Id.*)  Brown had no other

complaints and denied any pain.  (*Id.*)  He received no other medical treatment other

than advice to ice the affected area for the next twenty-four (24) hours and to return to

Health Services when needed.  (*Id.*)  Brown signed section 9B of the form affirming

that his symptoms as recorded on the form reflected his statements.  (*Id.*)

On October 19, 2007, Brown returned to Health Services for a follow-up

appointment complaining of pain in his left shoulder and left knee and lower back pain.

(Doc. 22 ¶ 33; Doc. 21-2 at 8 ¶ 5; Doc. 21-2 at 37.)  He made no complaints regarding

his left foot.  (*Id.*)  Brown was diagnosed with muscle strain.  (*Id.*)  There was no

indication of swelling or any deformities, and he had full range of motion.  (*Id.*)  X-

rays of the spine, lower extremities, and left shoulder were ordered and completed on

this same date.  (*Id.*; Doc. 21-2, Radiology Report, at 50-52.)  X-rays of the spine

revealed multilevel degenerative changes and degenerative joint disease of both hips.[7]

---

[7]In his Complaint, Brown alleges that the X-Ray equipment at USP Canaan does
not meet the "qualifications under the community standard of care that is required to diagnose bone
injuries."  (Doc. 1 ¶ 32.)  The medical equipment at USP Canaan, including the x-ray equipment, is
(continued...)

(Doc. 21-2 at 52.)  X-rays of the left shoulder showed mild deformity, possibly due to an old fracture.  (*Id.* at 51.)  X-rays of the lower extremities were negative, except for degenerative joint disease.  (*Id.* at 50.)  Ibuprofen was prescribed for pain.  (Doc. 22 ¶ 33; Doc. 21-2 at 37.)

On October 23, 2007, Brown was evaluated during sick call for continued pain in his left shoulder, lower back, and left knee.  (Doc. 22 ¶ 34; Doc. 21-2 at 9 ¶ 6; Doc. 21-2 at 34, 37.)  During this visit, Brown stated that his pain was an 8 to 10 on a scale of 1 to 10, with 10 being the worst.  (*Id.*)  The examination revealed that there was no edema or deformity.  (*Id.*)  The range of motion from Brown's waist was limited, and there was some tenderness noted in his back.  (*Id.*)  He had full range of motion in his knee.  (*Id.*)  A cane and abdominal binder were issued, and Brown's work classification status was changed to "convalescent" until October 30, 2007.  (Doc. 21-2 at 43-45.)  In addition, Naproxen was prescribed and Ibuprofen was discontinued because Brown reported that it was not helping.  (*Id*. at 34.)

On November 2, 2007, Brown was evaluated for continued pain in his left shoulder, left knee, and lower back.  (Doc. 22 ¶ 35; Doc. 21-2 at 9 ¶ 7; Doc. 21-2 at 34-

---

[7](...continued)
examined bi-annually by the Great Lakes Biomedical Company.  (Doc. 22 ¶ 31; Doc. 21-2 at 7, Sullivan Decl., ¶ 3.)  Any discrepancies are reported.  (*Id.*)  During the time of Brown's treatment, the X-ray equipment was functional.  (*Id.*)

35.)  No changes were noted during this visit other than the fact that Brown's range of motion around his waist had increased.  (*Id.*)  The X-ray results were explained to Brown, and he was directed to continue using the cane and binder.  (*Id.*)

On November 14, 2007, Brown was seen by medical staff for the same conditions.  (Doc. 22 ¶ 36; Doc. 21-2 at 9 ¶ 8; Doc. 21-2 at 35.)  He was in no acute distress during this visit and was ambulatory.  (*Id.*)  Acetaminophen was prescribed and Brown was educated regarding his medication and its effects.  (*Id.*)

On December 5, 2007, Brown was seen by medical staff for the same conditions. (Doc. 22 ¶ 37; Doc. 21-2 at 10 ¶ 9; Doc. 21-2 at 32-33.)  During this visit, Brown reported feeling better, but he still had lower back pain and left knee discomfort.  (*Id.*) Brown still was using the cane and asked about stretching exercises.  (*Id.*)  He also reported having pain in his chest with no shortness of breath.  (*Id.*)  Brown was directed to continue taking his medication as needed for pain and also was educated on performing stretching exercises.  (*Id.*)

On January 9, 2008, Brown was seen by medical staff for complaints of lower back and left knee pain and discomfort, which he alleged stemmed from injuries he sustained on October 18, 2007.  (Doc. 22 ¶ 38; Doc. 21-2 at 10 ¶ 10; Doc. 21-2 at 30, 33.)  Brown reported that the Acetaminophen that he had been prescribed did not help

his pain. (*Id.*) Accordingly, Naproxen was prescribed, CT scans of the spine and left knee were ordered, and a referral for a consultation with a neurologist was made regarding the lower back pain. (*Id.*) In addition, Brown's cane was re-issued and he was educated on performing stretching exercises. (*Id.*)

On January 15, 2008, Brown failed to report for his scheduled appointment in the chronic care clinic. (Doc. 22 ¶ 39; Doc. 21-2 at 10 ¶ 11; Doc. 21-2 at 30.)

On January 28, 2008, Brown was evaluated during sick call for complaints of pain in his lower back. (Doc. 22 ¶ 40; Doc. 21-2 at 10 ¶ 12; Doc. 21-2 at 30-31.) He had some tenderness in his lower back, but he showed good range of motion. (*Id.*) He was directed to continue taking Naproxen, and he was educated on the medication and its effects. (*Id.*)

On January 30, 2008, Brown was seen in the chronic care clinic by Dr. Bhatti. (Doc. 22 ¶ 41; Doc. 21-2 at 11 ¶ 13; Doc. 21-2 at 28-29.) During this visit, although he rated his pain as a five (5) on a scale of one (1) to ten (10), Brown reported "I'm getting better" and "I've been doing stretching." (Doc. 21-2 at 28.) He also reported symptoms of depression and requested a renewal of his pain medications. (*Id.*) Brown was prescribed Amitryptaline, a generic of Elavil, and his prescription for Naproxen was renewed. (*Id.* at 29.) He also was informed that his evaluation with the

neurologist was pending.  (*Id.*)

### 3.  Facts Relating to Brown's Medical Treatment at FCI Fort Dix

On February 5, 2008, Brown was transferred to a lesser security institution, FCI Fort Dix, where he remained both at the time of filing the instant action and the instant Motion.  (Doc. 22 ¶ 42; Doc. 21-2 at 11 ¶ 14.)  According to medical records from FCI Fort Dix, on March 24, 2008, Brown was evaluated by medical staff at that institution. (Doc. 22 ¶ 43; Doc. 21-2 at 11 ¶ 15; Doc. 21-2 at 24-25.)  Brown complained of lower back pain and reported that his right knee sometimes "gives out."  (*Id.*)  It was noted that Brown was not in acute distress and that he still was walking with a cane.  (*Id.*) Brown reported that he had been informed at his prior institution that he would have a CT scan and asked when it would occur.  (Doc. 21-2 at 25.)  Brown was referred to the Medical Officer for further evaluation.  (*Id.*)

On April 1, 2008, Brown was evaluated in the chronic care clinic.  (Doc. 22 ¶ 44; Doc. 21-2 at 11 ¶ 16; Doc. 21-2 at 22-23.)  There were no significant changes from previous examinations.  (*Id.*)  He was advised to continue on his prescribed medications and the use of his cane.  (*Id.*)

On April 11, 2008, the Utilization Committee reviewed Brown's case and disapproved a CT scan.  (Doc. 22 ¶ 45; Doc. 21-2 at 11 ¶ 17; Doc. 21-2 at 23.)  The

Committee recommended that X-ray results be reviewed prior to conducting a CT scan. (*Id.*)

On May 9, 2008, Brown was seen for a psychiatric evaluation. (Doc. 22 ¶ 46; Doc. 21-2 at 12 ¶ 18; Doc. 21-2 at 20.) He reported that he was depressed and had a history of depression. (*Id.*) Brown stated that he experienced chronic pain and an inability to walk because of a cart accident in October 2007. (*Id.*) An anti-depressant was prescribed. (*Id.*)

On July 9, 2008, Brown was seen by FCI Fort Dix medical staff and reported that he had no pain or discomfort in his left or right shoulder. (Doc. 22 ¶ 47; Doc. 21-2 at 12 ¶ 19; Doc. 21-2 at 18-19.) However, it was noted that Brown reported that he was told that he had a fractured shoulder when he was hit by a moving E-Z Go cart at USP Canaan.[8] (*Id.*) He informed the physician that he needed his cane for balance. (*Id.*) Because he had bullet fragments in his back, an X-ray of the lumbar spine was ordered to determine the location and size of the bullet fragments. (*Id.*) It was noted that an MRI would be completed if the fragments were small, but if they were large, a CT scan would be completed. (*Id.*) Brown was instructed to continue on his

---

[8]X-rays of Brown's left shoulder completed at USP Canaan on October 19, 2007, one day after the incident involving the E-Z Go cart, showed "mild deformity of scapular body, possibly due to old fracture." (Doc. 21-2 at 51.)

medications, and a referral for an orthopaedic consultation was written.  (*Id.*)

On July 15, 2008, an X-ray of Brown's right shoulder showed mild degenerative changes.  (Doc. 22 ¶ 48; Doc. 21-2 at 12 ¶ 20; Doc. 21-2 at 49.)  An X-ray of Brown's left shoulder showed mild degenerative changes with mild spurring present.  (Doc. 21-2 at 48.)  Otherwise, the study was normal.  (*Id.*)  An X-ray of Brown's lumbar spine revealed multilevel degenerative disc disease, spondylosis, and degenerative joint disease of both hips.  (Doc. 21-2 at 47.)  Spondylosis is degenerative arthritis.  (Doc. 21-2 at 12 n.1.)

On September 10, 2008, Brown was seen by institution medical staff for a follow-up.  (Doc. 22 ¶ 49; Doc. 21-2 at 13 ¶ 21; Doc. 21-2 at 15.)  He was directed to continue his medications while he was waiting for his orthopaedic consult.  (*Id.*)  On September 25, 2008, Brown was seen in the orthopaedic clinic and approved for an MRI of his lower back.  (Doc. 22 ¶ 50; Doc. 21-2 at 13 ¶ 22; Doc. 21-2 at 16, 38.)  At the time of filing the instant Motion, Brown was waiting for an MRI.  (Doc. 22 ¶ 51; Doc. 21-2 at 13 ¶ 23.)

### B.      Exhaustion of Administrative Remedies

#### 1.      *Bivens* Claims

Section 1997e(a) of Title 42 of the United States Code provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). A prisoner must exhaust all available administrative remedies before initiating a federal lawsuit. *Booth v. Churner*, 532 U.S. 731, 739 (2001). Failure to exhaust available administrative remedies is an affirmative defense. *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002). As such, the failure to exhaust available administrative remedies must be pleaded and proven by the Defendants. *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002).

Defendants have properly raised the matter of exhaustion of administrative remedies made available to inmates confined within the BOP. (*See* Doc. 21 at 9 n.6; Doc. 21-2 at 55, Albert Decl., Ex. 10.) The BOP Administrative Remedy Program is described at 28 C.F.R. Part 542. The purpose of the program "is to allow an inmate to seek formal review of an issue relating to any aspect of his/her own confinement." 28

C.F.R. § 542.10(a).  Inmates first must informally present their complaints to staff, and staff shall attempt to informally resolve any issue before an inmate files a request for administrative relief.  28 C.F.R. § 542.13(a).  If unsuccessful at informal resolution, the inmate may raise his complaint with the warden of the institution where he is confined. *Id.* at § 542.14(a).  If dissatisfied with the response, the inmate then may appeal an adverse decision to the Regional Office and the Central Office of the BOP.  *Id.* at § 542.15(a).   Defendants have presented computerized records of Brown's pursuit of administrative remedies while confined in BOP custody.  The undisputed facts establish the following with regard to Brown's filing of administrative remedies:

According to SENTRY records, Brown has filed twenty-eight (28) administrative remedies during his time in BOP custody.  (Doc. 21-2 at 56 ¶ 6, Albert Decl., Ex. 10; Doc. 21-2 at 64-78, Administrative Remedy Generalized Retrieval Records, Ex. 12; Doc. 21-2 at 79-89, Administrative Remedy Documents, Ex. 13.) Five (5) of the twenty-eight (28) remedies Brown filed pertain to the issues raised in the Complaint.  (*Id.*)  The records show that, although Brown exhausted on the issue of improper medical care for his back, shoulders, and knee, he has not filed any administrative remedies relating to injuries to his foot, legs, or other parts of his body, and thus has not exhausted with regard to those injuries alleged in the Complaint.  (*See*

Doc. 1 ¶¶ 61, 65.)  In addition, Brown has not filed any administrative remedies regarding his claims that medical staff negligently completed the Inmate Injury Assessment form on October 15, 2007 (*Id.* ¶ 30), that the USP Canaan X-ray equipment is faulty (*Id.* ¶ 32), or that Defendant Holloway may not be licensed by Pennsylvania to practice medicine (*Id.* ¶ 36), and therefore, he has not exhausted these issues.

Although Brown filed an administrative remedy requesting an MRI, he also did not exhaust this issue.  (Doc. 21-2 at 57 ¶ 7.)  BOP records show that, following an attempt at informal resolution (*see* Doc. 21-2 at 82), on November 20, 2007, Brown filed administrative remedy 473927-F1 requesting an MRI.  (*Id.* at 56 ¶ 7; Doc. 21-2 at 80, 11/20/07 Request for Administrative Remedy.)  The administrative remedy was denied by the Warden and closed on December 6, 2007.  (Doc. 21-2 at 79, 12/6/07 Response.)  On January 7, 2008, Brown appealed the Warden's decision and filed administrative remedy number 473927-F1 at the Regional level.  (*Id.* at 56 ¶ 7; Doc 21-2 at 76.)  This administrative remedy was rejected for being untimely.  (*Id.*)  Although Brown was given the opportunity to explain his untimeliness, he failed to re-file this administrative remedy.  (*Id.*)  Therefore, he did not exhaust the issue regarding his request for an MRI.

However, Brown has exhausted his claims with respect to the medical care he received for his back, shoulders, and knee. (Doc. 21-2 at 57 ¶ 7.) BOP records show that, on February 15, 2008, Brown filed administrative remedy number 482746-F1 at the institution level complaining of improper medical care for his left shoulder, lower back, and left knee. (*Id.* ¶ 8.) This administrative remedy was denied and closed by the Warden on March 21, 2008. (*Id.*) On April 11, 2008, Brown appealed the Warden's decision by filing administrative remedy 482746-R1 at the Regional level. (*Id.*; Doc. 21-2 at 77, 85.) This administrative remedy was denied and closed by the Regional Office on May 8, 2008. (Doc. 21-2 at 57 ¶ 8; Doc. 21-2 at 77, 87.) On May 27, 2008, Brown filed an appeal from the Regional Director's decision by filing administrative remedy number 482746-A1 with the Central Office. (Doc. 21-2 at 57-58 ¶ 8; Doc. 21-2 at 88.) In a response dated June 24, 2008, the Central Office noted that Brown was being monitored in the Chronic Care Clinic and advised "for informational purposes only" that his request for monetary compensation should be pursued through the appropriate statutorily mandated procedure. (Doc. 21-2 at 89.) Accordingly, the administrative remedy was closed. (*Id.*)

## 2. Tort Claim

The FTCA, 28 U.S.C. § 2671 *et seq.*, is a statutory waiver of sovereign

immunity for tort claims. *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997). The FTCA allows the government to be sued "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. However, as the FTCA is an express waiver of sovereign immunity, strict compliance with its provisions is required. *Livera v. First Nat'l Bank*, 879 F.2d 1186, 1194 (3d Cir. 1989).

As a prerequisite to a suit under the FTCA, a claim first must be presented to, and denied by, the federal agency. The FTCA provides:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury . . . unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

28 U.S.C. § 2675(a). In the instant case, on March 24, 2008, Brown filed an administrative tort claim with the BOP Northeast Regional Office in which he alleged the following basis for his claim:

> A Federal Bureau of Prisons Officer hit the claimant with a [*sic*] Easy Go Cart. (vehicle) The vehicle had no lights in rear nor front lights. Also no horn or sound device to indicate it was backing up. Also, driver of vehicle did not look to see if anyone was in harm's way when [he] backed up vehicle.

(Doc. 21-2 at 60, Administrative Tort Claim Form.) Brown alleged that he sustained "permanent lower back damage, permanent knee damage." (*Id.*) He requested

compensation in the amount of $500,000.00. (*Id.*) On September 18, 2008, BOP

Regional Counsel Henry J. Sadowski issued the following response:

> After careful review of this claim, I have decided not to offer a settlement.
> Investigation reveals that the cart's signaling devices were operational, the
> driver used all necessary and appropriate caution, and you failed to avoid
> the cart. Furthermore, there is no evidence that you suffered any
> significant injury as a result of this encounter. There is no evidence to
> suggest you experienced a compensable loss as the result of negligence on
> the part of any Bureau of Prisons' employee. Accordingly, your claim is
> denied.

(Doc. 21-2 at 59, 9/18/08 Response.)

The administrative tort claim does not contain any allegations regarding the

medical treatment Brown received after the October 18, 2007 incident. (*See* Doc. 21-2

at 60.) As a result, Brown has not exhausted the professional negligence claims

asserted under the FTCA in his Complaint that the "severe injuries" he sustained to his

"shoulder, neck, back, knee, legs, foot and other parts of his body [as a result of the

October 18, 2007 incident] have become lifetime injuries caused by the BOP

deprivation of the mandatory community standard of care on October 18, 2007, and

continuing through February, 2008 when the Plaintiff was transferred to Fort Dix

Prison." (Doc. 1 ¶¶ 23-41.) The Court now will analyze the claims Brown

successfully has exhausted.

**C.** ***Bivens* Claims**

### 1.	Defendant Felker

Brown alleges that Defendant Felker violated the cruel and unusual punishment clause by crashing into him, thereby causing him to suffer "serious lifetime injuries" (Doc. 1 ¶ 60).

The Eighth Amendment to the United States Constitution states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend VIII. Accordingly, the Eighth Amendment protects inmates from "unnecessary and wanton infliction of pain." *Fuentes v. Wagner*, 206 F.3d 335, 344 (3d Cir. 2000) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (citations and internal quotations omitted)). To maintain an Eighth Amendment claim of cruel and unusual punishment against a prison official, a plaintiff must establish that the official acted with "deliberate indifference." *Farmer v. Brennan,* 511 U.S. 825, 832-34 (1994). Accordingly, "the plaintiff has the burden to show that defendant knew of, and disregarded, an excessive risk to his health or safety." *Davis v. Muscarella,* 615 F. Supp. 2d 296, 301 (D. Del. 2009) (citing *Beers-Capitol v. Whetzel,* 256 F.3d 120, 133 (3d Cir.2001) (citations omitted)). "The knowledge requirement is subjective, 'meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have

been aware.'" *Davis,* 615 F. Supp. 2d. at 301 (quoting *Farmer,* 511 U.S. at 841).

In the instant case, the undisputed factual record establishes that Defendant Felker is entitled to judgment as a matter of law with regard to Brown's Eighth Amendment claim against him. Specifically, the uncontroverted evidence submitted by Defendants, consisting of the surveillance video of the outside corridor, the Declarations of Defendant Felker and Officer Geary, and the Memorandum of Officer Geary, shows that Brown intentionally walked into the left side of the E-Z Go cart that Felker was driving on October 18, 2007 with the intent of being able to file a lawsuit against the government for any injuries he might sustain. (Ex. 2, Surveillance Video (under seal); Ex. 1, Felker Decl. (under seal); Doc. 21-2 at 4, Ex. 5, Geary Decl.; Ex. 7, Geary Memorandum (under seal) (stating that another inmate overheard Brown telling other inmates that he walked into a moving E-Z Go cart and had been waiting for an opportunity to do so to be able to sue the government for his injuries).) The video also clearly shows that Brown was not run over as he alleges, but rather remained standing after he came into contact with the cart. (*See* Ex. 2.) The video also shows that the driver of the cart did not "run" after the incident, but rather remained with the cart and parked it. (*See id.*)

Notwithstanding the video surveillance of the outside corridor showing the

incident, additional undisputed evidence submitted by Defendants, consisting of the photographs depicting the cart that was operated by Defendant Felker on October 18, 2007, and the video surveillance from the inside corridor, establishes that Felker did not strike Brown with the cart, but rather, that Brown intentionally walked into it with the left side of his body. The physical characteristics of the cart are such that it would be impossible for the driver of the cart to strike an individual or object with the rollbar. In particular, the photograph of the left side of the cart shows a large step on the rear of the cart that would prevent the rollbar from striking an individual, even if the cart were to bump into the individual from behind. (Doc. 21-2 at 90, Ex. 14-A.) Therefore, in order for an individual to make contact with the rollbar, he or she would have to walk into it. Indeed, the surveillance video of the inside of the corridor (Ex. 3) provides additional evidence indicating that Brown walked into the cart and struck his left shoulder. The inside video shows Brown walking toward Health Services after the incident and reaching up with his right hand to touch his left shoulder, thus indicating that he likely struck his left shoulder on the cart's rollbar. (*See* Ex. 3.) In order for Brown's left shoulder to have made contact with the rollbar of the cart, he had to have walked into it.

In opposing the instant Motion, Brown has failed to submit evidence to refute

Defendants' evidence. Although Brown argues in his opposition brief that Felker disregarded Brown's safety by operating the cart after dark and that the cart did not have "mandatory lights for driving in the dark" (*see* Doc. 28 ¶ 79), this argument, without more, is insufficient to refute the video surveillance submitted by Defendants showing that the cart was being operated in a well-illuminated area and the Declarations of Defendant Felker and Officer Geary stating that the reverse alarm from the cart began to sound when Felker put the cart into reverse. (Ex. 2; Ex. 1, Felker Decl. (under seal); Doc. 21-2 at 4, Ex. 5, Geary Decl.) Therefore, the uncontroverted evidence establishes that Defendant Felker did not disregard an excessive risk to Brown's safety by intentionally crashing into him, and he is entitled to judgment as a matter of law on Brown's Eighth Amendment Claim against him.

## 2. Defendants Tucker and Holloway

Brown alleges that Defendants Tucker and Holloway exhibited deliberate indifference to his serious medical needs in violation of the Eighth Amendment by failing to provide him with "the mandatory community standard of care" (*Id.* ¶ 61) and by "intentionally denying or delaying medical care" (*Id.* ¶ 62). Brown has exhausted his claims with respect to the medical care he received for his back, shoulders, and knee. (*See* Doc. 21-2 at 64-78, Administrative Remedy Generalized Retrieval Records,

Ex. 12; Doc. 21-2 at 79-89, Administrative Remedy Documents, Ex. 13.)

In order to establish an Eighth Amendment claim against a defendant for inadequate medical care, a plaintiff must show "(i) a serious medical need, and (ii) acts or omissions . . . that indicate deliberate indifference to that need." *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). *See also Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that a layperson would recognize the need for a doctor's attention. *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987). In addition, "if 'unnecessary and wanton infliction of pain' results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the eighth amendment." *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).

The test for whether a prison official was deliberately indifferent is whether that defendant "acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 841. "The official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Thus, a complaint that a physician "has

been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment . . . ." *Estelle*, 429 U.S. at 106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer v. O'Carroll*, 991 F.2d 64, 67 (citations omitted.) Furthermore, in the prison medical context, deliberate indifference generally is not found when some significant level of medical care has been offered to an inmate. *Clark v. Doe*, 2000 WL 1522855, at *2 (E.D. Pa. Oct 13, 2000) ("courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care"). Courts will "disavow any attempt to second guess the propriety or adequacy of a particular course of treatment . . . which remains a question of sound professional judgment." *Little v. Lycoming County,* 912 F. Supp. 809, 815 (M.D. Pa. 1996) (quoting *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir. 1979)). Mere disagreement as to the proper medical treatment does not support an Eighth Amendment claim. *Monmouth County Correctional Institutional Inmates v. Lanzaro,* 834 F.2d 326, 346 (3d Cir. 1987) ("Courts, determining what constitutes deliberate indifference, have consistently held that mere allegations of malpractice do not raise issues of constitutional import . . . Nor does mere disagreement as to the proper medical treatment support a claim of an eighth

amendment violation."); *White v. Napoleon,* 897 F.2d 103, 110 (3d Cir. 1990) (mere disagreement over proper treatment does not state a claim upon which relief can be granted).

The undisputed factual record establishes that, during the three (3) months after the October 18, 2007 incident when Defendants Tucker and Holloway were involved in his care, Brown was medically evaluated on nine (9) occasions, and that on each of those occasions, he received treatment that was responsive to the symptoms that he reported.  (*See* Doc. 22 ¶¶ 32-41; Doc. 21-2 at 8-11, Sullivan Decl., ¶¶ 4-13; Doc. 21-2 at 28-45, 50-54, Medical Records.)  Specifically, the undisputed factual record shows that Brown received X-rays on equipment that was properly maintained and functioning properly at the time the films were taken; orthopedic consultations; over-the-counter medications; prescription medications; a cane; an abdominal binder; and adjustments to his work status.  (*Id.*)  Further, he was instructed on stretching exercises to perform to alleviate the pain of which he complained.  (*Id.*)

Brown alleges in his Complaint and argues in his opposition to the instant Motion that "the mandatory community standard of care" required that an "MRI or other bone density X-Rays" be used to diagnose his injuries and "would have showed the serious level of [his] injuries."  (*See* Doc. 1 ¶ 38; Doc. 28, Opposing Brief,

¶¶ 28-61.) However, Brown's claims amount to nothing more than disagreement with the medical treatment he received, which is insufficient to state a constitutional claim. *See Lanzaro, supra*, 834 F.2d at 346; *White, supra,* 897 F.2d at 110. Because the undisputed factual record shows that Brown received medical treatment that was responsive to the symptoms he reported, there is no evidence to support a claim of deliberate indifference on the part of Defendants Tucker and Holloway, and they are entitled to judgment as a matter of law.

### D.  Tort Claim

Brown exhausted the portion of his FTCA claim alleging that he sustained personal injuries when he was struck and run over by an E-Z Go cart operated by Defendant Felker.[9] (Doc. 1 ¶¶ 5-6, 15-23.) It is well-settled that, in considering a FTCA claim, a federal district court must apply the law of the state in which the alleged tortious conduct occurred. 28 U.S.C. § 1346(b)(1); *Turner v. Miller*, 679 F. Supp. 441, 443 (M.D. Pa. 1987). To establish a cause of action for negligence in Pennsylvania, a plaintiff must prove the following elements: (1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the

---

[9]Because Brown has not exhausted the portion of his FTCA claim alleging professional negligence on the part of Defendants Tucker and Holloway (*see* § II B.2., *supra*), we do not reach the issue of whether this portion of the FTCA claim should be dismissed as a result of Brown's failure to file a Certificate of Merit as required by Pennsylvania Rule of Civil Procedure 1042.3.

conduct and the resulting injury; and (4) actual damages. *Northwest Mutual Life Ins. Co. v. Babayan*, 430 F.3d 121, 139 (3d Cir. 2005); *Pittsburgh Nat'l Bank v. Perr*, 637 A.2d 334, 336 (Pa. Super. Ct. 1994). Further, under Pennsylvania law, a plaintiff is required to show that the defendant's negligence was the proximate cause of his injury by a preponderance of the evidence. *See Baum v. United States*, 541 F. Supp. 1349, 1351 (M.D. Pa. 1982). Pennsylvania law defines proximate cause as causation which was a substantial factor in bringing about the injury. *See Hamil v. Bashline*, 392 A.2d 1280, 1284 (1978).

The government's duty of care to federal prisoners is one of ordinary diligence, meaning that the United States must "exercise reasonable care and diligence to protect the prisoner from danger, known to or which might reasonably be apprehended by him." 18 U.S.C. § 4042; *See also Turner*, 679 F. Supp. at 443 (quoting *Hossic v. United States*, 682 F. Supp. 23, 25 (M.D. Pa. 1987)). In the instant case, Brown has not presented any evidence demonstrating that the government breached a duty to him with respect to Defendant Felker's actions. The undisputed factual record establishes that Defendant Felker exercised ordinary diligence in looking behind him before backing up the E-Z Go cart, which emitted a reverse alarm as it began backing up. (*See* Doc. 22 ¶ 6; Ex. 1, Felker Decl., ¶ 7 (under seal); Doc. 21-2 at 6, Ex. 6, Geary

Memorandum.)  The undisputed factual record also establishes that Felker did not run over Brown with the cart and then leave the scene, but rather that Brown walked into the side of the E-Z Go cart with the intent of being able to file a lawsuit against the government for any injuries he might sustain.  (Ex. 2, Surveillance Video (under seal); Ex. 1, Felker Decl. (under seal); Doc. 21-2 at 4, Ex. 5, Geary Decl.; Ex. 7, Geary Memorandum (under seal) (stating that another inmate overheard Brown telling other inmates that he walked into a moving E-Z Go cart and had been waiting for an opportunity to do so to be able to sue the government for his injuries).)   Because Brown has not presented any evidence to refute Defendants' showing that the United States did not breach its duty of ordinary diligence to Brown, the United States is entitled to judgment as a matter of law on Brown's FTCA claim.

## III.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss and/or for Summary Judgment (Doc. 14) will be granted, and judgment will be entered in favor of Defendants the United States of America, Falker, Tucker, and Holloway.  An appropriate Order will enter on today's date.